UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
———————————————————————

MICHAEL S. STEINMAN,

        Plaintiff,

        -vs-                       07-CV-532-JTC

MORTON INTERNATIONAL, INC.,
f/k/a Morton Salt Company,
f/k/a New Moon International, Inc.,

MORTON SALT COMPANY, a division of
Morton International, Inc.,

NEW MORTON INTERNATIONAL, INC., and

ROHM AND HAAS COMPANY, INC.,

        Defendants.
———————————————————————

MORTON INTERNATIONAL, INC.,

        Third-Party Plaintiff,

        -vs-

MERZ METAL & MACHINE CORP.,

        Third-Party Defendant.
———————————————————————

APPEARANCES:   MICHAEL GREGORY COOPER, ESQ., Hamburg, New York, for Plaintiff.

                 PERSONIUS MELBER LLP (SCOTT R. HAPEMAN, of Counsel), Buffalo, New York, for Defendants Morton International, Inc., Morton Salt Company, New Morton International, Inc., and Rohm and Haas Company.

                 HURWITZ & FINE (MICHAEL F. PERLEY, ESQ., of Counsel), Buffalo, New York, for Third-Party Defendant Merz Metal & Machine Corp.

This action was originally brought in New York State Supreme Court, Erie County, on July 11, 2007, and was removed to this court in August 2007 on the basis of the diversity of citizenship of the parties, in accordance with 28 U.S.C. §§ 1332 and 1441. Plaintiff Michael S. Steinman seeks damages under the common law of negligence and New York State Labor Law §§ 200, 240(1), and 241(6) for personal injuries allegedly sustained on July 12, 2004 while performing demolition work on behalf of his employer, Merz Metal & Machine Corp. ("Merz Metal"), at a salt mining facility owned and operated by defendant Morton International, Inc. ("Morton").[1] After answering the complaint, Morton brought a third-party action for indemnification against Merz Metal (Item 7).

Following discovery, both Morton and Merz Metal moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing plaintiff's complaint as a matter of law or, in the alternative, for a ruling on Morton's indemnification claim against Merz Metal (*see* Items 26 & 27). Plaintiff filed a cross-motion for partial summary judgment on Morton's liability under New York Labor Law § 240(1) (Item 33). What follows is the court's ruling on these motions.

### BACKGROUND

In the spring of 2004, Morton hired Merz Metal to fabricate and install a new carbon steel "coal hopper" (or "bunker") to replace the old concrete coal hopper located on the

---

[1]Defendant Morton International, Inc., is an Indiana corporation with its principal place of business in Illinois. Defendant Morton Salt Company is a division of Morton International, and "New Morton International" is a former corporate name of Morton International (*see* Item 1, Notice of Removal, ¶¶ 4-6). Defendant Rohm and Haas Company, Inc., is a Delaware corporation and is the corporate parent of Morton International (*see* Item 4, Corporate Disclosure Statement).

mezzanine level of the power house at Morton's facility in Silver Springs, New York. The coal hopper was utilized to distribute coal through discharge grates to a conveyor belt situated on the mezzanine floor directly below the hopper, which then conveyed the coal to the power house boiler. The mezzanine itself was a steel-construction platform utilized as a walkway for access to the conveyor belt apparatus, rising approximately ten feet above the power house floor.

The coal hopper project required Merz Metal to demolish and remove the old concrete hopper, which was in deteriorating condition after many years of continuous use, prior to installing the new steel hopper. During the demolition phase, the length of the conveyor apparatus was covered by a plywood platform built by Merz Metal at a height of approximately three feet above the mezzanine floor to protect the conveyor belt from being damaged by demolition debris.

The old concrete hopper itself was approximately one hundred feet long, twelve feet across, and six feet deep, shaped like a "half pipe." It was suspended at a height of approximately four feet above the mezzanine floor (and two feet above the conveyor belt) by steel straps attached to structural beams on the ceiling. At one end of the hopper was a brick wall built from the floor of the mezzanine to the top of the hopper. The bricks were mortared to the outside and inside walls of the hopper to function as both a "cradle" and, on the inside of the hopper, an "end cap."

At the time of the accident in July 2004, plaintiff was a union sheet metal worker employed by Merz Metal and assigned to the coal hopper project at the Morton facility. By July 12, plaintiff and other Merz Metal employees had been working on the demolition of the old hopper for about two weeks, and had reached the brick "end cap" structure.

Plaintiff and a co-worker, Scott Snuszki, had begun demolishing the "end cap" by using hand-held forty-pound pneumatic jack hammers, working from the plywood platform on top of the conveyor belt apparatus, when a portion of the brick structure collapsed and landed on plaintiff, injuring his leg (*see generally* Item 33, Plaintiff's Affidavit, ¶¶ 5-7, and Exs. I, J & K attached thereto).

In his complaint in this case, plaintiff alleges the following four causes of action against Morton:

1.     Negligence, by way of breach of the common-law duty on the part of the premises owner to provide a reasonably safe workplace (Item 1, Complaint, ¶¶ 9-12).

2.     Failure to protect against injury by objects falling from an elevated height in violation the common-law duty to provide a safe workplace, as codified in New York Labor Law § 200 (*id.* at §§ 13-15).

3.     Failure to provide adequate safety devices to protect against objects falling from an elevated height, in violation of New York Labor Law § 240(1) (*id.* at §§ 16-19).

4.     Failure to comply with statutory and regulatory requirements for providing adequate protection and safety to demolition workers, in violation of New York Labor Law § 241(6) and Part 23 of the New York Industrial Code (*id.* at ¶¶ 20-22).

Morton moves for summary judgment on the following grounds:

1.     Plaintiff's first and second causes of action under the common law of negligence and Labor Law § 200 should be dismissed because Morton did not supervise or control plaintiff's work.

2.      Plaintiff's third cause of action should be dismissed because the injury caused by collapse of a wall during demolition is not the type of elevation-related accident contemplated by Labor Law § 240(1).

3.      Plaintiff's fourth cause of action should be dismissed because the provisions of the industrial code upon which plaintiff relies are insufficient to support a claim under Labor Law § 241(6).

4.      If any cause of action survives summary judgment, Morton is entitled to a defense and indemnification from Merz Metal pursuant to the written agreement between the parties governing the demolition work.  (*See* Morton's Briefs, Items 28, 50, 52, 59).

Merz Metal has joined Morton's motion to the extent it seeks dismissal of plaintiff's claims under Labor Law §§ 240(1) and 241(6).  Merz Metal also moves for summary judgment in its favor on Morton's contractual indemnification claim on the ground that the indemnification clause in the applicable contract between Morton and Merz Metals is void and unenforceable as against public policy under the laws of both New York and Illinois (*see* Merz Metal's Briefs, Items 26, 45, 48, 54).

Plaintiff has filed a cross-motion for summary judgment seeking a ruling that Morton is liable as a matter of law for failing to provide the protections contemplated by Labor Law § 240(1) (*see* Plaintiff's briefs, Items 33, 41, 56).

Each of these grounds for relief is taken up in turn below.

## **DISCUSSION**

**I.    Summary Judgment**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A fact is considered to be "material" only if it "might affect the outcome of the suit under the governing law . . . ," and a dispute regarding a material fact is considered to be genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also Bryant v Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

In making its determination on a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162,167 (2d Cir. 1991).  The court's role is not to resolve issues of fact, but rather to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.  When "little or no evidence may be found in support of the nonmoving party's case . . . [and] no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  *Gallo v. Prudential Resid. Servs., L.P.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted).

## II.     New York Labor Law § 240(1)

The issue central to all three pending motions is whether Morton can be held liable under Labor Law § 240(1) for the injuries sustained by plaintiff when the brick structure he was in the process of demolishing collapsed.  Commonly referred to as the "scaffold law," section 240(1) provides:

> **Scaffolding and other devices for use of employees**
>
> 1.      All contractors and owners and their agents, except owners of one and two-family dwellings who contract for but do not direct or control the work, in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed.

The primary legislative intent of the scaffold law was "to achieve the purpose of protecting workers by placing 'ultimate responsibility for safety practices at building construction jobs where such responsibility actually belongs, on the owner and general contractor,' instead of on workers, who are scarcely in a position to protect themselves from accident." *Zimmer v. Chemung County Performing Arts, Inc.*, 65 N.Y.2d 513, 520 (1985) (quoting 1969 NY Legis Ann, at 407; other quotation marks and citations omitted).

The New York courts have interpreted this provision to impose "absolute liability for a breach which has proximately caused an injury.  Negligence, if any, of the injured worker is of no consequence." *Rocovich v. Consolidated Edison Co.*, 78 N.Y.2d 509, 513 (1991).  Likewise, it is well settled "that the duty imposed by Labor Law § 240(1) is nondelegable and that an owner or contractor who breaches that duty may be held liable in damages

regardless of whether it has actually exercised supervision or control over the work." *Ross v. Curtis-Palmer Hydro-Electric Co.*, 81 N.Y.2d 494, 500 (1993).

However, "not every hazard or danger encountered in a construction zone falls within the scope of Labor Law § 240(1)" so as to render the owner or contractor absolutely liable for an injured worker's damages. *Misseritti v. Mark IV Const. Co., Inc.*, 86 N.Y.2d 487, 490 (1995). The New York Court of Appeals has made it clear that the protection afforded by the statute is limited to liability for injuries arising from "special hazards" related to the effects of gravity, *i.e.*, where the enumerated protective devices ("scaffolding," "hoists," "stays," "braces," etc.) are required because "the work site either is itself elevated or is positioned below the level where 'materials or load [are] hoisted or secured.'" *Ross*, 81 N.Y.2d at 500-01 (quoting *Rocovich*, 78 N.Y.2d at 514). As explained at further length in the *Ross* decision:

> The "special hazards" to which we referred in *Rocovich* . . . do not encompass *any and all* perils that may be connected in some tangential way with the effects of gravity. Rather, the "special hazards" referred to are limited to such specific gravity-related accidents as falling from a height or being struck by a falling object that was improperly hoisted or inadequately secured. In other words, Labor Law § 240(1) was designed to prevent those types of accidents in which the scaffold, hoist, stay, ladder or other protective device proved inadequate to shield the injured worker *from harm directly flowing from the application of the force of gravity to an object or person*. The right of recovery afforded by the statute does not extend to other types of harm, even if the harm in question was caused by an inadequate, malfunctioning or defectively designed scaffold, stay or hoist.

*Ross*, 81 N.Y.2d at 501 (emphasis in original).

Section 240(1) "applies to both 'falling worker' and 'falling object' cases. With respect to falling objects, Labor Law § 240(1) applies where the falling of an object is related to 'a significant risk inherent in . . . the relative elevation . . . at which materials or loads must be

positioned or secured.'" *Narducci v. Manhasset Bay Associates*, 96 N.Y.2d 259, 267-68 (2001) (quoting *Rocovich*, 78 N.Y.2d at 514). Because of the many different hazardous scenarios faced by workers at elevated construction sites, the courts have been cautioned to carefully examine the record to determine whether the plaintiff's injury involved "the type of risk that Labor Law § 240(1) was intended to address." *Narducci*, 96 N.Y. 2d at 268.

> [T]he fact that an injured plaintiff may have been working at an elevation when the object fell is of no moment in a "falling object" case, because a different type of hazard is involved. Working at an elevation does not increase the risk of being hit by an improperly hoisted load of materials from above. The hazard posed by working at an elevation is that, in the absence of adequate safety devices (e.g., scaffolds, ladders), a worker might be injured in a fall. By contrast, falling objects are associated with the failure to use a different type of safety device (e.g., ropes, pulleys, irons) also enumerated in the statute. Because the different risks arise from different construction practices, the hazard from one type of activity cannot be "transferred" to create liability for a different type of accident.

*Id.* (citing *Ross*, 81 N.Y.2d at 501). Thus, a plaintiff injured by a falling object seeking to impose absolute liability under section 240(1) must show more than that the object fell from above. "A plaintiff must show that the object fell, while being hoisted or secured, *because of* the absence or inadequacy of a safety device of the kind enumerated in the statute." *Id.* (emphasis in original).

In addition, a significant body of case law has developed the principle that section 240(1) does not impose absolute liability on an owner or contractor for injury to a worker caused by an object falling from the same elevation level at which the work was being performed. *See, e.g., Abbud v. City of New York*, 1997 WL 633463, at *11 & n. 10 (S.D.N.Y. Oct. 10, 1997) (citing 19 cases). This principle has been applied in several cases involving injuries caused by the collapse or disintegration of a wall or similar structure during

demolition or construction activities. *See, e.g., Misseritti*, 86 N.Y.2d at 491 (collapse of 22-foot high concrete-block fire wall newly completed at same level where plaintiff was working was not "the type of elevation-related accident that section 240(1) is intended to guard against"); *Peay v. New York City School Const. Authority*, 35 A.D.3d 566, 568, 827 N.Y.S.2d 189, 192 (2nd Dep't 2006) (cinder block wall that collapsed on plaintiff working on scaffold "was at the same level as his space and therefore was not a falling object for purposes of Labor Law § 240(1)"), *leave to appeal denied*, 8 N.Y.3d 807 (2007); *Bennett v. SDS Holdings*, 309 A.D.2d 1212, 764 N.Y.S.2d 763, 765 (4th Dep't 2003) (top section of wall frame which fell on plaintiff from 10 feet above "was part of the wall that plaintiff was demolishing, which was at the same elevation as plaintiff"); *Terry v. Mutual Life Ins. Co. of New York*, 265 A.D.2d 929, 695 N.Y.S.2d 808 (4th Dep't 1999) (plaintiff injured during garage demolition project when piece of wall near where he was working fell on him; no liability under § 240(1) "[b]ecause the base of the wall was at the same elevation as plaintiff's worksite").

Applying these principles to the undisputed facts developed during discovery in this case reveals that the injury suffered by plaintiff while he and Mr. Snuszki were demolishing the brick structure situated on the mezzanine level of the Morton facility is not the type of elevation-related hazard that section 240(1) was intended to address. First of all, the fact that plaintiff was working on a makeshift platform on the elevated mezzanine level where the coal hopper was located when the bricks fell upon him "is of no moment in [this] 'falling object' case . . . ." *Narducci*, 96 N.Y. 2d at 268. Plaintiff was injured by falling bricks, not by falling from the platform or mezzanine, and the elevation of the mezzanine or platform

in relation to each other, or to the ground floor below, is simply irrelevant to the court's determination as to the applicability of section 240(1). Rather, the relevant measurement of any height differential in this case is the difference between the elevation level where plaintiff was positioned when he was injured and the level of the object which fell on him. *See id.* at 269-70; *Rocovich*, 78 N.Y.2d at 514.

In this regard, the evidence presented to the court by way of the parties' summary judgment motions establishes that the sections of brick which fell on plaintiff were an integral part of the entire brick structure located at the end of the concrete coal hopper. This structure was consistently referred to as a "wall" by all of the deposition witnesses–including plaintiff–who testified as to their first-hand knowledge of the work site. The integrated brick wall was built from the floor of the mezzanine to the top of the coal hopper, and functioned both as a "cradle" and as an "end cap" for the hopper. The record contains no precise measurements of the dimensions of the integrated wall structure, but the information contained in the deposition testimony and affidavits indicates that the plywood platform upon which plaintiff was positioned at the time of the accident was situated on top of the conveyor apparatus approximately two or three feet above the mezzanine floor, and the top of the wall was approximately seven or eight feet above the plywood platform.

These dimensions are confirmed by the photographs of the site submitted as Exhibits I, J, and K to plaintiff's affidavit in support of his cross-motion (Item 33). For example, Exhibit I is a photograph depicting a man in a reclining position on the plywood platform where plaintiff was working at the time of the accident. The photograph shows the portion of the wall that remained standing after the accident, referred to as the "cradle" for

the coal hopper. The bottom of the cradle has been removed, but the photograph shows that the very bottom of the cradle was approximately two feet above the plywood platform, directly in front of where plaintiff was working. Exhibit K is a photograph showing two segments of a brick structure lying on top of a pneumatic hammer, positioned on the plywood platform directly in front of the cradle. Plaintiff affirms that this photograph "accurately depicts the large parabolic shaped brick structures which were situated within the coal bunker and fell below crushing my leg as we attempted to complete the demolition of this end cap." Item 33, Plaintiff's Affidavit, ¶ 7.

This evidence shows that while the portion of the structure which collapsed and landed on plaintiff's leg fell from a height of somewhere between two and eight feet above the level of the plywood platform where plaintiff was positioned, the entire integrated structure at the end of the concrete coal hopper was situated at the same level as the work site. The "brick structures" which fell on plaintiff were "an integral part of the ground-level structure that he was involved in demolishing. Consequently, the height from which the [structures] fell is irrelevant." *Amato v. State*, 241 A.D.2d 400, 401, 660 N.Y.S.2d 576, 577 (1st Dep't 1997), *leave to appeal denied*, 91 N.Y.2d 805 (1998). Based on this showing, and considering the substantial weight of authority in the cases cited above, the conclusion is inescapable that the collapse of the end cap portion of the wall is not "the type of elevation-related accident that section 240(1) is intended to guard against. Rather, the accident that resulted in [plaintiff's] injuries is the type of peril a construction worker usually encounters on the job site." *Miseritti*, 86 N.Y.2d at 491 (internal citations omitted).

The cases relied on by plaintiff do not dictate a different conclusion. For example, in *Runner v. New York Stock Exchange, Inc.*, 13 N.Y.3d 599 (2009), the plaintiff was injured

while attempting to move an 800-pound reel of electrical wire down a flight of four stairs by using a makeshift pulley device, which was inadequate to do the job. In *Outar v. City of New York*, 286 A.D.2d 671, 730 N.Y.S.2d 138 (2nd Dep't 2001), *aff'd*, 5 N.Y.3d 731 (2005), the plaintiff was injured when an unsecured dolly, which was stored on top of a five-and-a-half foot high "bench wall" adjacent to the worksite, fell and hit him. In *Anaromo v. Slattery Associates, Inc*, 298 A.D.2d 339 (2nd Dep't 2002), the plaintiff was injured when the "manlift" basket he was working in, elevated about twelve feet above the ground, suddenly shifted, causing him to lose control of a 60- to 80-pound steel plate he was holding above his head. Finally, the plaintiffs in both *Salinas v. Barney Skanska Construction Co.*, 2 A.D.3d 619 (2nd Dep't 2003), and *Jones v. Lehr Construction Corp.*, 13 Misc. 3d 1213 (A), 2006 WL 2770085 (Sup. Ct. Bronx Co. 2006), were injured when air conditioning ducts fell on top of them from the ceiling above.

In each of these cases, the injury to the plaintiff was the direct consequence of the owner/contractor's failure to utilize a statutorily enumerated device to protect against a risk plainly arising from a "physically significant" workplace elevation differential posed by moving a heavy metal object. *Runner*, 13 N.Y.3d at 603. The factual scenarios are plainly distinguishable from the facts presented in this case, where the plaintiff was injured while demolishing a portion of a stationary wall on the same level as the work site. In the court's view, the cases cited by plaintiff do not provide persuasive authority contrary to the holdings in the "falling wall" cases cited above.

Accordingly, the court finds that Morton is entitled to summary judgment dismissing plaintiff's section 240(1) claim as a matter of law.

### III.    New York Labor Law § 241(6)

Morton also moves for summary judgment dismissing plaintiff's claim under New York Labor Law § 241(6), which provides:

**Construction, excavation and demolition work**

> All contractors and owners and their agents, except owners of one and two-family dwellings who contract for but do not direct or control the work, when constructing or demolishing buildings or doing any excavating in connection therewith, shall comply with the following requirements:
> . . . .

> 6.    All areas in which construction, excavation or demolition work is being performed shall be so constructed, shored, equipped, guarded, arranged, operated and conducted as to provide reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places.  The commissioner may make rules to carry into effect the provisions of this subdivision, and the owners and contractors and their agents for such work, except owners of one and two-family dwellings who contract for but do not direct or control the work, shall comply therewith.

Like the duty imposed by § 240(1), the duty to provide protection imposed by § 241(6) is non-delegable, and thus a plaintiff asserting a viable claim under this provision "need not show that defendants exercised supervision or control over his worksite in order to establish his right of recovery."  *Ross*, 81 N.Y.2d at 502.  However:

> The rules governing liability under Labor Law § 240(1) and § 241(6) differ in at least two material respects.  Contributory and comparative negligence are valid defenses to claims asserted under the latter section, while section 240(1) claims are not subject to those defenses.  Furthermore, a breach of Labor Law § 240(1)'s requirements leads to "absolute" liability, while a breach of a duty imposed by a regulation promulgated under Labor Law § 241(6) is merely some evidence of negligence.

*Id.* at 502 n. 4 (citing *Long v. Forest-Fehlhaber*, 55 N.Y.2d 154 (1982)).

To state a viable claim under section 241(6), a plaintiff must allege that the defendant violated a specific provision of the New York Department of Labor Industrial Code, which

is set forth at Title 12, Part 23, of the NYCRR.  *See Ross*, 81 N.Y.2d at 501-02.  The alleged

Code violation must be grounded upon a breach of a "specific, positive command," rather

than a general "reiteration of common-law standards" regarding the ordinary duty to provide

a safe workplace.  *Id.* at 504; *see also Rizzuto v. L.A. Wenger Contracting Co.*, 91 N.Y.2d

343, 349 (1998).  Furthermore, in order to succeed on a section 241(6) claim, the plaintiff

must demonstrate that the predicate Code violation "was the proximate cause of the

accident."  *Ares v. State of New York*, 80 N.Y.2d 959, 960 (1992).

Plaintiff did not plead any specific Industrial Code provisions as a basis for his

section 241(6) claim, but he did identify several provisions in response to Morton's demand

for interrogatories (*see* Item 27, Ex. E, Interrogatory No. 8).  Then, in his Supplemental

Memorandum of Law (Item 41) submitted in response to Morton's summary judgment

motion, plaintiff narrowed his focus to the following three provisions:  12 NYCRR § 23-

3.3(c), 12 NYCRR § 23-1.7(a)(1), and 12 NYCRR § 23-3.3(b)(3).[2]

### A.    12 NYCRR § 23-3.3(c)

Section 23-3.3(c) provides:

> Inspection.   During hand demolition operations, continuing inspections shall
> be made by designated persons as the work progresses to detect any
> hazards to any person resulting from weakened or deteriorated floors or walls

---

[2]The court has reviewed the remaining Industrial Code provisions identified in plaintiffs' response to Morton's interrogatories, specifically, sections 23-1.5 (general responsibility of employers); 23-1.7(d) (slipping hazards); 23-1.7(e)(2) (tripping and other hazards in working areas); 23-1.10(b)(1) (power shut-off requirements for pneumatic hand tools); 23-1.15 (safety railing); 23-1.22(c) (platforms); 23-3.3(g) (hand demolition protection); 23-3.4(b) (mechanical demolition/structural stability); 23-5 (scaffolding); and 23-5.1 (general provisions for all scaffolds).  As Morton points out in its motion papers, each of these provisions either is too general to provide a sufficient predicate for a section 241(6) claim, or is inapplicable to the facts of this case.  Accordingly, the court will consider only the three Industrial Code provisions identified in plaintiff's Supplemental Memorandum as the relevant predicates.

or from loosened material. Persons shall not be suffered or permitted to work where such hazards exist until protection has been provided by shoring, bracing or other effective means.

The purpose of this regulation "is to fashion a safeguard, in the form of 'continuing inspections,' against hazards which are created by the progress of the demolition work itself." *Monroe v. City of New York*, 67 A.D.2d 89, 100, 414 N.Y.S.2d 718, 725 (2nd Dep't 1979); *see also Salinas*, 2 A.D.3d at 622, 414 N.Y.S.2d at 563.

Morton relies on *Campoverde v. Bruckner Plaza Associates, L.P.*, 50 A.D.3d 836, 837, 855 N.Y.S.2d 268, 269 (2nd Dep't 2008), which held that the hazards sought to be avoided by section 23-3.3(c) are related to "structural instability caused by the progress of the demolition," not the hazards created by the actual performance of the demolition work itself. *Id.*, 50 A.D.3d at 837, 855 N.Y.S.2d at 269; *see also Smith v. New York City Housing Authority*, 71 A.D.3d 985, 987, 897 N.Y.S.2d 232, 234 (2nd Dep't 2010) ("The hazard which allegedly caused the injured plaintiff's accident arose from the actual performance of the demolition work, not structural instability caused by the progress of the demolition, the hazard sought to be avoided by that provision of the Industrial Code."). According to Morton, because the evidence in this case clearly shows that the collapse of the brick structure which caused plaintiff's injury resulted from the actual performance of the demolition work rather than instability which resulted from the progress of the demolition work already performed, section 23-3.3(c) is not applicable.

For his part, plaintiff cites several cases which hold that this regulation applies to the performance of the demolition work. For example, in *Bennett*, the plaintiff was injured while demolishing an interior wall of a building when the top section of the wall frame fell on him.

The Appellate Division, Fourth Department, found section 23-3.3(c) "sufficiently specific" to serve as a predicate for a claim under section 241(6), and that the defendant had failed to meet its burden to establish the regulation's inapplicability to the facts of the case. *Bennett*, 309 A.D.2d at 1212, 764 N.Y.S. 2d at 765. Similarly, in *Salinas*, the plaintiff was injured when a large heavy air conditioning duct fell on him while he was performing demolition work. The Second Department held that section 23-3.3(c) "applies to the demolition work being performed by the plaintiff," and the defendants "failed to make a prima facie showing that the required inspections were performed . . . ." *Salinas*, 2 A.D.3d at 622-23, 769 N.Y.S.2d at 563; *see also Balladares v. Southgate Owners Corp.*, 40 A.D.3d 667, 670835 N.Y.S.2d 693, 697 (2nd Dep't 2007) (plaintiff injured while demolishing brick wall using a jackhammer; court held section 23-3.3(c) applies to demolition work being performed by plaintiff, and defendant failed to show inspections were performed).

Morton also argues that even if the court should find this particular Code provision applicable to these facts, the evidence also shows that plaintiff's co-worker Scott Snuszki performed an inspection of the brick wall prior to demolishing it, which satisfied the requirements of section 23-3.3(c) (*see* Item 27-3, Ex. J, p. 20). However, the court's review of the record reveals the existence of factual issues regarding the nature and scope of Mr. Snuszki's inspection.

Mr. Snuszki testified at his deposition that he and plaintiff were told by their on-site foreman, Steve Walek, to demolish the wall, but were not given any further instructions about how they should proceed (*see* Item 27-3, Ex. J, p. 17). Mr. Snuszki was then asked:

> Q. After Mr. Walek instructed you to take down the wall, did you and [plaintiff] inspect the wall at all before you started work?

> A.     Yeah.  Yes, we did.

(*Id.* at p. 20).  However, during plaintiff's deposition, the following exchange took place:

> Q.     Was there any sort of inspection of that wall before that day, where you talked about how [the demolition] was going to be done?
>
> A.     No.
>
> . . . .
>
> Q.     Did you inspect how the wall was attached to anything, if at all, before you started work on that wall?
>
> A.     No.
>
> Q.     Do you know if anybody at Merz Metal had done any sort of inspection to see whether [the wall was attached] or not?
>
> A.     I don't know.

(Item 26, Ex. H, pp. 34, 36-37).  In the court's view, this testimony raises a genuine issue of fact regarding whether any inspection of the end wall took place prior to or during the course of the demolition activities in a manner sufficient to satisfy the requirements of section 23-3.3(c).

Based on this review of the record in light of the pertinent case law, the court finds that Morton has failed to show either that the requirements of 12 NYCRR § 23-3.3(c) are inapplicable to the facts of this case, or that the inspection performed by Mr. Snuszki satisfies those requirements.  Accordingly, Morton is not entitled to summary judgment dismissing plaintiff's section 241(6) claim based on a violation of 12 NYCRR § 23-3.3(c).

**B.     12 NYCRR § 23-1.7(a)(1)**

Section 23-1.7(a)(1) provides:

Overhead hazards.

(1)  Every place where persons are required to work or pass that is normally exposed to falling material or objects shall be provided with suitable overhead protection.  Such overhead protection shall consist of tightly laid sound planks at least two inches thick full size, tightly laid three-quarter inch exterior grade plywood or other material of equivalent strength.  Such overhead protection shall be provided with a supporting structure capable of supporting a loading of 100 pounds per square foot.

Morton contends that this regulation cannot serve as a predicate for plaintiff's section 241(6) cause of action because the injury was not caused by "falling material or objects."  However, as the discussion above with respect to plaintiff's section 240(1) claim amply demonstrates, there is at least a triable issue of fact regarding whether the injury resulted from material and objects falling on plaintiff from overhead and, consequently, whether the injury might have been prevented by the type of structure required by section 23-1.7(a)(1).

Morton also argues that implementation of the overhead protections required by the provision would have made the demolition of the brick wall impossible to accomplish, citing *German v. City of New York*, 14 Misc.3d 1204(A), 2006 WL 3717684 (Sup. Ct. New York Co. 2006) (structure required by regulation would make demolition of overhead water pipes and duct work impossible to carry out).  In response, plaintiff cites a later case from the same trial court, *Mulvihill v. Brooklyn Law School*, 22 Misc.3d 1114(A), 2009 WL 189031, *7  (Sup. Ct. New York Co. 2009), which holds that the determination of the applicability of section 23-1.7(a)(1)  requires a showing that the accident site is "normally exposed to falling material or objects" to warrant "suitable overhead protection," often presenting a triable issue of fact precluding summary judgment.

Upon review of the record presented in this case in light of these holdings, the court finds that issues of fact exist for trial regarding the applicability of 12 NYCRR § 23-1.7(a)(1) as a predicate for plaintiff's section 241(6) claim. Accordingly, Morton is not entitled to summary judgment dismissing this claim as a matter of law.

## C. 12 NYCRR § 23-3.3(b)(3)

Section 23-3.3(b)(3) provides:

Demolition of walls and partitions.
. . .

(3) Walls, chimneys and other parts of any building or other structure shall not be left unguarded in such condition that such parts may fall, collapse or be weakened by wind pressure or vibration.

Morton contends that this regulation does not apply to the facts of this case, citing *Smith v. New York City Housing Authority, supra*. In the *Smith* case, the plaintiff was demolishing a cinder block wall with a jackhammer when a segment of the wall fell on his foot. The court found these facts sufficient to demonstrate, *prima facie*, that section 23-3.3(b)(3) did not apply "since the injured plaintiff testified that he was hammering one of the particular cinder blocks that fell in order to dislodge it from the wall." *Smith*, 71 A.D.3d at 987 (citing cases).

Plaintiff argues that the holding in *Smith* is not dispositive with respect to the applicability of section 23-3.3(b)(3), because there are genuine factual issues in this case regarding whether the end cap structure collapsed as a result of his use of a jackhammer to loosen the mortar between the bricks (as in *Smith*) or as a result of vibrations from Mr. Snuszki's jackhammer as he loosened a separate course of brick on the opposite side of

the wall. However, as demonstrated by the holding in *Smith*, the thrust of section 23-3.3(b)(3) is to ensure that during the demolition process walls and other parts of the structure are protected from collapse as the result of forces (such as wind pressure or vibration) other than the force being applied to the very object of the demolition process.

Accordingly, Morton is entitled to summary judgment dismissing plaintiff's claim under New York Labor Law § 241(6) to the extent it is predicated on a violation of 12 NYCRR 23-3.3(b)(3).

## IV. Common Law Negligence and New York Labor Law § 200

Plaintiff claims in his first cause of action that his injuries resulted from Morton's breach of the common law duty to provide a safe workplace (*see* Item 1, ¶¶ 9-12), and in his second cause of action that this breach of duty violated New York Labor Law § 200 (*see id.* at ¶ 14). Section 200 provides that the workplace:

> shall be so constructed, equipped, arranged, operated and conducted as to provide reasonable and adequate protection to the lives, health and safety of all persons employed therein or lawfully frequenting such places. All machinery, equipment, and devices in such places shall be so placed, operated, guarded, and lighted as to provide reasonable and adequate protection to all such persons.

N.Y. Labor Law § 200 (1). In recognition of this "codification of the common-law duty of a landowner to provide workers with a reasonably safe place to work . . . ," *Lombardi v. Stout*, 80 N.Y.2d 290, 294 (1992), "courts generally analyze claims brought under both § 200 and the common law simultaneously." *Wojcik v. 42nd Street Development Project*, 386 F. Supp. 2d 442, 455 n.15 (S.D.N.Y. 2005) (citing cases).

Morton's motion for summary judgment dismissing the first two causes of action is grounded on a well-recognized "implicit precondition" to the imposition of liability for breach of the duty to provide a safe workplace: "that the party charged with that responsibility have the authority to control the activity bringing about the injury to enable it to avoid or correct an unsafe condition." *Russin v. Louis N. Piciano & Son*, 54 N.Y.2d 311, 317 (1981). "This rule is consistent with the common law principle that 'an owner or general contractor could not be held responsible for the negligent acts of others over whom he had no direction or control.'" *Wojcik*, 386 F. Supp. 2d at 456 (quoting *Allen v. Cloutier Const. Corp.*, 44 N.Y.2d 290, 299 (1978)). According to Morton, the undisputed evidence in this case shows that Merz Metal, through its on-site foreman Steve Walek, exercised exclusive supervision and control over plaintiff's work at the time of the accident, and that Morton had nothing more than general supervisory authority over the work site.

However, the cases also recognize "two disjunctive standards for determining a property owner's liability" for breach of the duty to provide a safe workplace. *Chowdhury v. Rodriguez*, 57 A.D.3d 121, 128, 867 N.Y.S.2d 123, 129 (2nd Dep't 2008).

> The first is the authority to supervise the work when a plaintiff's injury arises out of defects or dangers in the methods or materials of the work. The second standard is applicable to worker injuries arising out of the condition of the premises rather than the methods or manner of the work. When a premises condition is at issue, a property owner is liable under Labor Law § 200 when the owner created the dangerous condition causing an injury or when the owner failed to remedy a dangerous or defective condition of which he or she had actual or constructive notice.

*Id.* (citations omitted).

Upon review of the evidence presented by way of the parties' motions, the court finds issues of fact remaining for trial with respect to whether plaintiff's injury arose out of the

methods used by Merz Metal employees to perform the demolition of the end cap wall, or was the result of a dangerous or defective condition which Morton should have been aware of. It is not a matter of serious dispute that the old concrete coal hopper, which Morton hired Merz Metal to demolish and replace, was in deteriorating condition after many years of use, and that the end cap wall had no independent interior reinforcement or visible means of exterior bracing other than support from the concrete hopper itself. From these circumstances, a rational juror could conclude that once the concrete "half-pipe" had been removed and the end cap wall was left to stand on its own, it might have presented an unreasonably dangerous condition to the demolition crew of which Morton should have had actual or constructive notice and should have taken steps to address.

Considering the record as a whole, and resolving all ambiguities and drawing all reasonable inferences in favor of plaintiff, the court does not find the evidence in the record regarding breach of the duty to provide a safe workplace "so one-sided that [Morton] must prevail as a matter of law." *Anderson*, 477 U.S. at 252. Accordingly, Morton is not entitled to summary judgment dismissing plaintiff's first two causes of action.

## V. Contractual Indemnification

Finally, Morton moves for summary judgment in its favor on its third-party claim against Merz Metal for contractual indemnification pursuant to the terms of the written agreement covering the demolition work. The indemnification clause provides, in pertinent part, as follows:

> [Merz Metal] agrees to indemnify, defend and hold harmless Morton, its agents, officers, directors, shareholders, employees, representatives, customers and invitees from and against any and all liability, claim, loss, damage, action, suit, cost or expense (including attorney fees) for injuries or

-23-

death to persons or damage to property of Morton and [Merz Metal], resulting from, arising out of, or in any way related to, directly or indirectly: (i) any act or omission of [Merz Metal] or of any of its agents (including the agents, officers, or employees of either of them) in connection with this Contract, regardless of fault; (ii) [Merz Metal]'s performance or failure to perform (or that of any of its agents) under this Contract; (iii) any claims, costs or expenses arising under any Worker's Compensation laws; or (iv) any breach of warranty, breach of contract, misrepresentation or false certification, or failure to exercise due care by [Merz Metal], agents or supplier, regardless of any active or passive negligence by Morton, except if the liability, claim, loss, damage, action, suit, cost or expense is a result of the willful misconduct or sole negligence of Morton.

(Item 27, Ex. K, ¶ 4(a)).

For its part, Merz Metal seeks summary judgment dismissing the third-party action against it on the ground that this clause is unenforceable, as a matter of law, under New York General Obligations Law § 5-322.1.[3]  That statute provides:

A covenant, promise, agreement or understanding in . . . a contract or agreement relative to the construction, alteration, repair or maintenance of a building, structure, appurtenances and appliances including moving, demolition and excavating connected therewith, purporting to indemnify or hold harmless the promisee against liability for damage arising out of bodily injury to persons or damage to property contributed to, caused by or resulting from the negligence of the promisee, his agents or employees, or indemnitee, whether such negligence be in whole or in part, is against public policy and is void and unenforceable . . . .

Although New York courts routinely find indemnification clauses like the one at issue here void as against public policy under § 5-322.1, the courts will also enforce contractual indemnification where the evidence establishes that the plaintiff's injuries were not attributable to negligence on the part of the promisee, "and that its liability was vicarious and

_____

[3]Morton and Merz Metals agree that New York law provides the pertinent standards for deciding the indemnification issue, notwithstanding the contract's forum selection clause which provides that questions relating to interpretation of contract terms "shall be determined in accordance with the laws of the State of Illinois . . . ."  (Item 27, Ex. K, ¶ 16).

purely statutory . . . ." *Colozzo v. National Center Foundation, Inc.*, 30 A.D.3d 251, 252, 817 N.Y.S.2d 256, 257 (1st Dep't 2006) (citing *Brown v. Two Exch. Plaza Partners*, 76 N.Y.2d 172, 180 (1990)). As the discussion above amply demonstrates, however, genuine issues of material fact remain for trial in this case with respect to whether Morton had notice of the dangerous condition of the premises which allegedly caused or contributed to plaintiff's injury. Accordingly, summary judgment is unavailable to either Morton or Merz Metal on the issue of contractual indemnification. *See, e.g., Cava Const. Co., Inc. v. Gealtec Remodeling Corp.*, 58 A.D.3d 660, 662, 871 N.Y.S.2d 654, 656 (2nd Dep't 2009) (questions of fact as to whether party seeking indemnification was free from negligence with regard to underlying accident precluded summary judgment on contractual indemnification claim); *Castrogiovanni v. Corporate Property Investors*, 276 A.D.2d 660, 660-61, 714 N.Y.S.2d 332, 333 (2nd Dep't 2000) (questions of fact concerning whether party seeking indemnification had notice of dangerous condition which allegedly caused injured plaintiff's accident).

## CONCLUSION

For the foregoing reasons, Morton's summary judgment motion (Item 27) is granted to the extent it seeks dismissal of plaintiff's claim under New York Labor Law § 240(1), and its claim under New York Labor Law § 241(6) predicated on a violation of 12 NYCRR 23-3.3(b)(3). Morton's motion is denied in all other respects.

Plaintiff's cross-motion for summary judgment (Item 33) is denied.

Merz Metal's motion for summary judgment (Item 26) is denied.

Upon resolution of these motions, the court determines that this case is now appropriate for referral to mediation pursuant to the court's Alternative Dispute Resolution Plan. A separate referral order for this purpose will follow.

So ordered.

\s\ John T. Curtin
JOHN T. CURTIN
United States District Judge

Dated: 11/17/2010                    , 2010
p:\pending\07-532.nov1.2010